UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
EWA ZANIEWSKA,

                    Plaintiff,

            - against -

THE CITY OF NEW YORK; COMMISSIONER OF
POLICE RAYMOND KELLY, INDIVIDUALLY AND
AS THE POLICE COMISSIONER OF THE CITY
OF NEW YORK; POLICE OFFICER LORMIL TAX
REGISTRY 938883, and POLICE OFFICERS
"JOHN DOE" 1-6 ALL BEING SUED IN THEIR
OFFICIAL AND INVIDUAL CAPACITIES,

                    Defendants.
-----------------------------------------------------------------X

**MEMORANDUM AND ORDER**

11-CV-2446 (RRM)(VVP)

ROSLYNN R. MAUSKOPF, United States District Judge.

On May 19, 2011, plaintiff Ewa Zaniewska filed this action against the City of New York,

Police Commissioner Raymond Kelly, Police Officer Ruth Lormil, and other unnamed John Doe

police officers.[1]  The claims set forth in the complaint arise from plaintiff's arrest at a party on June

20, 2010, and include causes of action under federal law for false arrest, malicious prosecution,

violations of equal protection on the basis of national origin profiling, and municipal liability, and

under state law for failure to train and negligent supervision and intentional infliction of emotional

distress.[2]  On April 15, 2013, defendants moved for summary judgment on all of plaintiff's claims.

(Doc. No. 48.)  For the reasons that follow, the Court grants defendants' motion in its entirety.

---

[1] Plaintiff has withdrawn her claims against Commissioner Kelly.  (Pl.'s Opp'n. (Doc. No. 54) at 21.)
[2] Plaintiff originally brought causes of action pursuant to New York City Administrative Code § 8-107(1) (the New York City Human Rights Law) and New York State Executive Law § 296 (the New York State Human Rights Law), both of which she has since withdrawn.  (Pl.'s Opp'n at 24.)

# BACKGROUND[3]

On June 19, 2010, plaintiff attended a party being held at 557 Union Street in Brooklyn. (56.1 Stmt. at ¶ 16.)  She had either been invited to the party on Facebook or by a man known as Remus Pop, who was squatting at 557 Union Street.  (*Id.* at ¶¶ 17, 39.)  Though the partygoers entered through 557 Union Street, the party was largely held in the vacant building adjacent to 557. (*See id.* at ¶ 32.)  The party, which was attended by about fifty to sixty other people, was called "LubaLand at the Forbidden Forest" and involved a DJ who played music through most of the night. (*Id.* at ¶¶ 26, 33, 34.)

On June 19 at approximately 10:30 a.m., a neighbor placed a 311 call complaining of loud music coming from 557 Union Street.  (56.1 Stmt. at ¶ 41.)  A second 311 call was placed by

---

[3] The facts in this Memorandum and Order are taken largely from defendants' 56.1 Statement of Undisputed Material Facts ("56.1 Stmt.") (Doc. No. 49) and the exhibits submitted in connection thereto.  Local Rule 56.1 requires a movant to submit "a short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried" along with "citation[s] to evidence which would be admissible."  Local Rule 56.1(a), (d).  In response, the nonmoving party must submit a response to that statement, consisting of "correspondingly numbered paragraph[s] . . . and if necessary, additional paragraphs containing a . . . statement of additional material facts to which it is contended that there exists a genuine issue to be tried."  Local Rule 56.1(b).  Critically, any statement made by the movant or opponent, "including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible."  Local Rule 56.1(d).  Any facts set forth in the movant's 56.1 statement that are not specifically controverted by the opposing party will be deemed admitted.  *See* Local Rule 56.1(c).

Plaintiff has largely failed to comply with her obligations under this rule.  Although plaintiff submitted a response to defendants' 56.1 statement, in the majority of instances she failed to controvert defendants' statements properly.  Plaintiff's responses to 24 of the 88 numbered paragraphs take the following form: "plaintiff admits, to the extent that [deponent in question] testified to such," or "plaintiff admits, to the extent that [a given piece of documentary evidence reflects that fact]."  (*See* Pl.'s 56.1 Resp. (Doc. No. 53) at ¶¶ 9-13, 15, 19-20, 22, 25, 38-39, 41-43, 49, 51, 56, 61, 70-71, 79, 83, 86, 88.)  In response to 17 other paragraphs, plaintiff purports to admit the relevant fact, but "only to the extent" of a characterization of the evidence that she then offers.  (*See* Pl.'s 56.1 Resp. at ¶¶ 25, 26, 28, 30, 33, 36, 40, 57-58, 64, 66, 68-69, 73, 75-76, 84.)  Several of plaintiff's ostensible denials of fact rely on evidence in the record that does not support those denials.  (*See id.* at ¶¶ 27, 46, 74.)  Others entirely fail to controvert the fact in question, but instead merely rephrase it.  (*See id.* at ¶¶ 31, 48, 72.)  A 56.1 statement is not the appropriate vehicle for legal arguments or recharacterizations of the evidence.  *See Costello v. New York State Nurses Ass'n*, 783 F. Supp. 2d 656, 662 n.5 (S.D.N.Y. 2011) (disregarding legal arguments made in 56.1 statements because they are more properly included in a memorandum of law).  Plaintiff has not complied with the spirit or letter of Rule 56.1.  *See Holtz. V. Rockefeller & Co., Inc.*, 258 F.3d 62, 74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is "to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.").  Accordingly, all material facts set forth in defendants' 56.1 statement are deemed admitted to the extent that they are adequately supported with record evidence and not properly controverted by plaintiff with a specific and relevant citation to evidence in the record.  *See Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact . . . set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.).

another neighbor later that day at approximately 7:32 p.m.  (*Id.* at ¶ 42.)  That call also complained of loud music that had been playing continuously throughout the day.  (*Id.*)  The party continued through the night and on June 20, five more 311 calls were made concerning the noise coming from 557 Union Street.  (*Id.* at ¶ 43.)  Finally, at 9:53 a.m. on June 20, a caller dialed 911 to report that between twelve and fifteen people had broken into an abandoned apartment at 557 Union Street with hammers and crowbars and remained in the building.  (*Id.* at ¶ 44.)

Police officers – among them Lieutenant Michelle Coyle ("Coyle") and Officer Ruth Lormil ("Lormil") – responded to the burglary in progress call.  (56.1 Stmt. at ¶ 45.)  Before arriving at the scene, Coyle called Lieutenant Patrick Diskin ("Diskin") to obtain information about 557 Union Street because she had previously heard Diskin mention the location at a commanders' meeting. (*Id.* at ¶ 46.)  Coyle remembers Diskin stating that the building was abandoned and known for squatters, and that the buildings department was in the process of having it condemned.  (Coyle Dep. (Defs.' Ex. L (Doc. No. 50-12)) (Pl.'s Ex. F (Doc. No. 52-6)) at 10:7-14.)  When the officers arrived, they observed that there were cracks on the outside of the building.  (56.1 Stmt. at ¶ 51.) To get inside the building, an officer had to enter through a window and then let the other officers inside.  (*Id.* at ¶ 54.)  The shared wall between 557 Union Street and 555 Union Street, the vacant adjacent building, was "busted" and there was "a big hole in the wall."  (*Id*. at ¶ 57.)

Upon entering the building and walking through the hole in the wall to 555 Union Street, the officers observed the DJ and a large group of partygoers.  (*Id.* at ¶¶ 58-59.)  At least some of the partygoers were asked who lived in the apartment and how they had permission to be there.  (*Id.* at 18, ¶ 60.)[4]  The partygoers, who were apparently free to leave at that point, did not know who owned the house.  (*Id.* at 18, ¶ 60; *see also* Coyle Dep. 16:17-18, 17:12-13.)  Based on these

---

[4] As the Court will discuss in more detail in Section I.B, the officers do not recall if plaintiff was specifically asked about her right, or lack thereof, to be at 557 or 555 Union Street.  (*See* Lormil Dep. 22:9-25; Coyle Dep. at 21:10-25.) Plaintiff herself alleges that she was never asked if she had permission to be there.  (Pl.'s Opp'n at 11.)

observations and the history of problems at the subject location, the officers concluded that the partygoers were trespassing.  (*See* 56.1 Stmt. at ¶ 62.)

Officers then asked plaintiff and the rest of the partygoers to provide identification.  (*See* Zaniewska Dep.  (Defs.' Ex. G (Doc. No. 50-7)) (Pl.'s Ex. B (Doc. No. 52-2)) at 89:17, 91:7.) Plaintiff, who is a foreign national from Poland, gave them her permanent resident card, which does not contain her address.  (Zaniewska Dep. at 92:4-8, 19-20.)  An officer requested a different form of identification, which plaintiff could not provide.  (*Id.* at 92:17-18.)  Shortly afterward, plaintiff was arrested, handcuffed and transported to the precinct in a van with between five and six other women.  (56.1 Stmt. at 22, ¶¶ 65-66.)  The rest of the partygoers, who had also been asked for identification, were likewise arrested at the scene and transported to the precinct. (Coyle Dep. at 19:23-25.)

At the precinct, a female officer searched plaintiff and confiscated a bag and some money from her that was later returned.  (Zaniewska Dep. at 102:21-25, 104:7-8.)  Plaintiff was then placed into a cell with the five or six other women with whom she had been transported to the precinct. (56.1 Stmt. at ¶ 73.)  Plaintiff was released from her handcuffs when she was placed in the holding cell.  (Zaniewska Dep. at 104:16-18.)  Plaintiff testified that the cell was too small to fit five to six women comfortably, and that after standing for a "long time," they "had to start sitting on the dirty bloody floors."  (*Id.* at 104:11-15.)  Some other arrestees gave the officers money to buy food; however, when the food arrived, plaintiff "was hungry but . . . couldn't eat" because she was nervous.  (*Id.* at 107:14-24.)[5]  Plaintiff was given water and access to a bathroom, though neither was provided in a timely fashion.  (*See* 56.1 Stmt. at ¶¶ 75-76.)

---

[5] Plaintiff insists that "[a]t no point [did] plaintiff testify that police provided her or even offered her food in the police precinct."  (Pl.'s 56.1 Resp. at ¶ 74.)  That assertion is belied by the portion of plaintiff's testimony that the Court quotes above.

At a certain point, some of the partygoers who had been arrested were released from the precinct with a desk appearance ticket (DAT).  (Coyle Dep. at 22:22-23.)  Plaintiff was not given a DAT.  (*See* 56.1 Stmt. at ¶ 78.)  To qualify for a DAT, there are several criteria that an arrestee must meet, one of which is possession of identification with a valid, verifiable address.  (*See* Coyle Dep. at 23:10-12;  Diskin Dep. (Defs.' Ex. D (Doc. No. 50-4)) (Pl.'s Ex. A (Doc. No. 52-1)) at 17:19-25.)  Plaintiff, as she herself admits, could not provide a formal identification that contained a verifiable address.  (*See* Zaniewska Dep. at 92:17-20.)

Only one of the five or six women with whom plaintiff was confined was released before the others in that group.  (*See* Zaniewska Dep. at 112:5-10.)  Plaintiff testified that this woman was released without being asked to present identification "because she works for government or something or some bank."  (*Id.* at 111:10-13.)  The remaining four or five women, some of whom may have been from the United States, were detained for the same length of time as plaintiff.  (*See id.* at 112:5-25.)  After approximately fifteen and a half hours at the precinct, plaintiff and these other women were transported to Central Booking, arriving at 5:32 in the morning.  (*See* 56.1 Stmt. at ¶¶ 79-80; Def. Ex. R. (Doc. No. 50-18).)  They remained at Central Booking for roughly another thirteen hours before they were released at 6:05 p.m. on June 21, 2010.  (*See* 56.1 Stmt. at ¶¶ 82-83.)  Plaintiff was not formally charged with anything and had no personal contact with a judge; rather, she walked through a courtroom, where a judge "waved" at her, and was subsequently released.  (*See id.* at ¶ 82; Zaniewska Dep. at 118:15-19.)

Plaintiff testified that as a result of her arrest and lengthy detention, she suffers from panic and anxiety attacks, has stopped going to school and work, cannot ride the subway, and is afraid of police officers.  (*See* Zaniewska Dep. at 143:11-17, 19-24.)  She has been seeing a therapist and is taking medication to deal with the effects of her experience.  (*See id.* at 136:7-8, 138:1-2)

On May 19, 2011, plaintiff filed this lawsuit against the City of New York, Officer Lormil, and several unnamed John and Jane Doe police officers.  She asserts claims against the individual defendants pursuant to 42 U.S.C. §§ 1981 and 1983 for false arrest, malicious prosecution, and violations of her right to equal protection arising from national origin discrimination.  (*See* Compl. at ¶¶ 39-41, 46-50, 53.)  As best the Court can discern, plaintiff also brings these claims pursuant to state law tort principles.  (*See id.* at ¶¶ 62-69, 70-78.)  In addition, she also brings a claim against the City of New York pursuant to Section 1983 and *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), alleging that the City engaged in a policy and practice of national origin profiling or, in the alternative that it failed to train its police officers properly.  (*See id.* at ¶¶ 56-29.)  She asserts a parallel state law cause of action against the City for failure to train and negligent supervision.  (*See id.* at ¶¶79-85.)  Finally, plaintiff includes a cause of action against the individual defendants for the state law tort of intentional infliction of emotional distress.  (*See id.* at ¶¶ 89-93.)

On April 15, 2013, defendants moved for summary judgment on all of plaintiff's claims. Defendants argue that the arresting officers had probable cause to arrest plaintiff at 557 Union Street, and therefore that her false arrest claims fail as a matter of law.[6]  (*See* Mot. Summ. J. at 5-9.) Defendants further state that because plaintiff was never prosecuted, there can be no malicious prosecution claim as a matter of law.  (*See id.* at 10.)  They also claim that plaintiff's treatment after her arrest was in no way due to discriminatory animus, and that she has provided no evidence to indicate that she was treated differently from other arrestees based on her national origin.  (*See id.* at 3-5.)  It follows, defendants argue, that without evidence of an underlying constitutional violation, the City cannot be held accountable for the behavior of the individual defendants.  (*See id*. at 13-

---

[6] Defendants also present extensive arguments on qualified immunity, which the Court declines to reach because it concludes that defendants had probable cause to arrest plaintiff.  *See Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (qualified immunity only comes into play "where it has been conceded or established that the officers arrested the plaintiff without a warrant *and without probable cause*) (emphasis added).

16.)  Finally, defendants contend that the officers' behavior did not nearly rise to the level of the extreme outrageousness required as an element of intentional infliction of emotional distress.  (*See id.* at 16-17.)  The Court takes each of these issues in turn, and finds all to be without merit.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 569(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "A fact is material when it might affect the outcome of the suit under governing law."  *Wong v. Yoo*, 639, F. Supp. 2d 34, 53 (E.D.N.Y. 2009).

"The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists."  *Wong*, 639 F. Supp. at 53.  In determining whether a genuine issue of material fact exists, therefore, the Court must draw all "justifiable" or "reasonable" inferences in favor of the non-moving party.  *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *see also Brosseau v. Haugen*, 543 U.S. 194, 195 n.1 (2004).  Nevertheless, once the moving party has shown that there is no genuine issue as to any material fact and that it is entitled to a judgment as a matter of law, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*,'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)), and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (citing cases).  In other words, the nonmovant must offer "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Anderson*, 477 U.S. at 256.

Where "the nonmoving party bears the burden of proof at trial, summary judgment is warranted if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to [its] case." *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (quoting *Celotex*, 477 U.S. at 322) (internal quotation marks omitted). Thus, "[a] defendant moving for summary judgment must prevail if the plaintiff fails to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case." *Allen v. Cuomo*, 100 F.3d 253, 258 (2d Cir. 1996) (citing *Anderson*, 477 U.S. at 247-48).

## DISCUSSION

### I.    False Arrest and Malicious Prosecution

Plaintiff brings false arrest and malicious prosecution claims against all defendants based on her arrest on June 20, 2010 and her subsequent detention. She argues that "[t]here is absolutely no evidence to support" a finding of probable cause for her arrest, and that defendants "acted maliciously to prosecute [her]." (Pl. Opp'n at 8, 13.) Having reviewed the record, the Court concludes that defendants did have probable cause to arrest plaintiff. Therefore, her false arrest and malicious prosecution claims must be dismissed as a matter of law.[7] *See Dickerson v. Napolitano*, 604 F. 3d 732, 751 (2d Cir. 2010) ("Probable cause is a complete defense to any action for false arrest or malicious prosecution in New York.").

### A. Legal Standards

Plaintiff brings her false arrest claim pursuant to both federal and state law. "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim

---

[7] Because the Court finds that defendants had probable cause to arrest plaintiff, it has no occasion to address defendants' argument that "plaintiff cannot establish a malicious prosecution claim because she was never prosecuted." (Mot. Summ. J at 10.) The Court declines to opine here as to whether a criminal proceeding was technically commenced against plaintiff for purposes of a malicious prosecution action.

for false arrest under New York law." *Weyant v. Okst*, 101 F. 3d 845, 852 (2d Cir. 1996). Under New York law, a plaintiff claiming false arrest must demonstrate that "(1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged." *Id*. at 853. "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Id*.

"To prevail on a Section 1983 malicious prosecution claim, a plaintiff must show a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interest under the Fourth Amendment,' and must establish the elements of a malicious prosecution claim under state law." *Washington v. County of Rockland*, 373 F.3d 310, 315-316 (2d Cir. 2004) (explaining that because an action must violate a federally protected right to constitute the basis of a Section 1983 claim, only violations of the Fourth Amendment may support a Section 1983 claim for malicious prosecution). Under New York law, the elements of malicious prosecution are as follows: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Jocks v. Tavernier*, 316 F.3d 128, 137 (2d Cir. 2003). The lack of probable cause is a necessary element of the cause of action, and so "it is well established that a finding of probable cause defeats a claim for malicious prosecution." *D'Angelo-Fenton v. Town of Cramel*, 470 F. Supp. 2d 387, 396 (S.D.N.Y. 2007).

"Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *U.S. v. Gagnon*, 373 F.3d 230, 236 (2d Cir. 2004). The test for probable cause is an

9

objective one and "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007). Moreover, "the existence of probable cause need not be assessed on the basis of the knowledge of a single officer." *Id.* Rather, probable cause may be satisfied "where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation." *Id.* This principle is "known as the collective or imputed knowledge doctrine, [and] recognizes that, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates." *Id*.

**B. <u>Probable Cause</u>**

Plaintiff was arrested under New York Penal Law § 140.05 for simple trespass. (Mot. Summ. J. at 7, n.3.) That statute provides that "[a] person is guilty of trespass when he knowingly enters or remains unlawfully in or upon the premises." N.Y. Penal Law § 140.05. Examining the totality of the circumstances in the light most favorable to plaintiff, the Court concludes that defendants clearly had probable cause to arrest her. Lieutenant Diskin's prior knowledge of the subject location, in conjunction with the 311 and 911 calls on the night in question and the officers' observations of the subject location, suffices to demonstrate that defendants had probable cause to arrest plaintiff.

Diskin testified that prior to June 20, 2010, he knew that 555 and 557 Union Street and were "chronic quality of life locations" and that he "received numerous complaints from neighbors, 311, and it had come up at meetings and commanding officer meetings." (Diskin Dep. at 9:9-13.) When asked what kinds of "chronic quality of life issues" those buildings raised prior to June 20, Diskin

replied: "squatters, dangerous conditions." (*Id.* at 9:17.)  While he did not have specific knowledge that 557 Union Street was condemned prior to June 20, 2010, Diskin had been on the premises before and received calls "about 557 Union Street about people being in there that [*sic*] shouldn't be" and had become "aware that the owners . . . had abandoned 557 Union Street to their bank, mortgage holder, Maspeth." (*Id.* at 9:9-10, 10:7-9, 12:15-21.)   Coyle, who responded to the 911 call at the scene, testified that both she and Diskin knew prior to June 20, 2010 that the location was abandoned. (*See* Coyle Dep. at 9:19-21, 10:7-21, 11:16-21.)  Plaintiff disputes this, claiming that Lieutenant Coyle had "no independent knowledge" of the location prior to June 20, 2010.  (Pl.'s 56.1 Resp. at ¶ 47.)  However, the portion of the record upon which she relies to make this assertion does not indicate that Coyle had no previous knowledge of the location, but merely that she called Diskin for "background on the location" because "she knew [he] had knowledge about it."  (Diskin Dep. at 8:25-9:3.)  The fact that Coyle called Diskin to ask for background information in no way implies that she had "no independent knowledge" of the location.  Furthermore, even if Coyle's personal knowledge of the subject location was limited, Diskin's more detailed knowledge is imputed to her for purposes of the probable cause analysis.  *See Zellner* 494 F.3d at 368 (discussing the collective or imputed knowledge doctrine).  It is clear from the record that defendants had sufficient prior knowledge of the subject location to form a reasonable belief that any party guests at the location were trespassing.

In addition to the prior incidents at 555 and 557 Union Street, there were a total of seven 311 calls complaining of excessively loud, continuous music playing at 557 Union Street on June 20, 2010.  (*See* 56.1 Stmt. at ¶¶ 41-43.)  There was also a 911 call made at 9:53 AM on that day, in which a male caller "stat[ed] that about 12 to 15 male and female perpetrators broke into an abandoned apartment building at 555 Union Street carrying hammers and crowbars and that the perpetrators [were] still in the building."  (*Id.* at ¶ 44.)  It was reasonable for the arresting officers to

rely upon these seven phone calls in deciding to arrest plaintiff and other partygoers for simple trespass. *See Brogdon v. City of New Rochelle*, 200 F. Supp. 2d 411, 421 (S.D.N.Y. 2002) (finding that it was reasonable for an arresting officer to rely on information from a 911 dispatcher, in conjunction with his own personal observations of a suspect's behavior); *Miloslavsky v. AES Engineering Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992) ("[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth.").

The appearance of 555 and 557 Union Street further supported defendants' determination that the location was abandoned and that the partygoers were trespassing. Lormil, who also responded at the scene, testified that when she arrived at 557 Union Street the building looked abandoned, in part because there were cracks in the building and a side door leading to the apartment inside was boarded up.[8] (*See* 56.1 Stmt. at ¶¶ 50-51; Lormil Dep. (Pl.'s Ex. D (Doc. No. 52-4)) (Defs.' Ex. M (Doc. No. 50-13)) at 10:5-6; 38:11-13.) Coyle testified that the apartment was a "disaster" and "a mess" that "there was stuff thrown everywhere," including a mattress on the floor, that "there was no . . . real furniture," and that the wall connecting 555 and 557 Union Street "was busted. It was like just a big hole in the wall." (Coyle Dep. at 15:14-24; *see also* 56.1 Stmt. at ¶¶ 55-58.) These observations contributed to the officers' determination that the location was abandoned. (*See* Defs.' Reply in Supp. (Doc. No. 51) at 7.)

---

[8] The parties disagree as to whether the doors to 555 and/or 557 Union Street were boarded up or broken. Both parties submitted photographic evidence purporting to resolve this dispute of fact. (*See* Pl.'s Ex. E (Doc. No. 52-5); Def. Ex N (Doc. No. 50-14).) Defendants assert that "the front door of 557 Union was not intact and appeared to be broken" and that the building looked abandoned "because the door to enter the apartment was boarded up" (56.1 Stmt. at ¶¶ 50, 52.) Plaintiff argues that defendants could not have had probable cause to arrest her for trespass because "557 Union Street was not boarded up in any fashion." (Pl.'s Opp'n at 8.) She also points out that "[t]here was no signage in front of the subject building or the hallway immediately within indicating eviction, abandonment, or condemnation proceedings." (Pl.'s Opp'n at 9.) These facts, though in dispute, are not material to an arrest for simple trespass under N.Y. Penal Law § 140.05. Simple trespass, unlike criminal trespass, does not require that the property be enclosed or fenced. *See Davis v. City of New York*, 373 F. Supp. 2d 322, 332 (S.D.N.Y. 2005). Nor does the New York Penal Code "require 'No Trespassing' signs to indicate that the property is closed to the public." *Id.* The Court, therefore, may grant summary judgment for defendants based on a finding of probable cause, notwithstanding this particular dispute of fact. *See Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 10 (2d Cir. 1986) (noting that the existence of factual issues, where those issues are not material to the claims before the court, will not suffice to defeat a motion for summary judgment).

The arresting officers asked the partygoers if they knew who lived at the subject location in an attempt to determine whether the partygoers had permission to be there.  (*See* Lormil Dep. at 16:12-18; Coyle Dep. at 16:17-23, 17:2-4, 21:4-9.)  Plaintiff alleges that no officer spoke to her directly and that "at no time [] did Coyle or arresting officer Ruth Lormil . . . ever investigate or ask [p]laintiff if she had permission to be at the subject premises."  (Pl.'s Opp'n at 11.)  Neither Lormil nor Coyle can remember specifically if plaintiff was asked whether she had permission to be there or given an opportunity to leave.  (*See* Lormil Dep. at 22:9-25; Coyle Dep. at 21:10-25.)  Plaintiff argues that this omission indicates that "due to the lack of investigation" into plaintiff's intent to remain unlawfully, "there is no way that any reasonable police officer could believe probable cause existed to arrest [p]laintiff for trespass."  (Pl.'s Opp'n at 11.)  It is true that N.Y.P.L. § 140.05 requires that a person "*knowingly* enter[] or remain[] unlawfully in or upon premises."  N.Y. Penal Law § 140.05 (emphasis added).  Indeed, if plaintiff honestly believed that she was licensed to enter or remain on the premises, she could not be found guilty of any degree of trespass.  *See, e.g.*, *People v. Basch*, 365 N.Y.S.2d 836, 840 (1975) (emphasizing the intent requirement of § 140.05); *People v. Ranieri*, 534 N.Y.S.2d 287, 289 (App. Div. 1988) (holding that where defendants believe they have a license or privilege to be on the premises, "such belief, even if mistaken, negate[s] the element of knowing unlawful remaining"). However, the critical inquiry in a probable cause analysis is not whether a defendant could ultimately be found guilty of the act for which she was arrested.  *See Nelson v. Hernandez*, 524 F. Supp. 2d 212, 220 (E.D.N.Y. 2007) (noting that "the validity of an arrest does not depend on an ultimate finding of guilt or innocence" (relying on *Pierson v. Ray*, 386 U.S. 547, 555 (1967)).  "Rather, the soundness of the arrest hinges on the existence of probable cause at the time the arrest was made."  *Id.* (citation omitted).  The fact that plaintiff, among a large group of partygoers, was not specifically offered the opportunity to leave or explain herself does not preclude a finding of probable cause under the totality of the circumstances.  *See id*. ("The quanta of

13

proof necessary to establish probable cause is only the probability, and not the prima facie showing, of criminal activity.").

Plaintiff also alleges that "[i]t was apparent throughout this entire incident that the police sought after only one thing, to apprehend 'Remus Pop,' the alleged squatter at that subject location . . . Defendants placed Plaintiff and the other party goers under arrest under the guise of trespass where their true agenda was placing them under arrest for not succumbing to their threats."  (Pl.'s Opp'n at 10.)  Plaintiff's allegations in this vein do not raise a triable issue of fact.  The legality of plaintiff's arrest under both federal and state law is measured by the objective circumstances, not by the subjective motivations of the arresting officers.  *See Mason v. Town of New Paltz Police Dept.*, 103 F. Supp. 2d 562, 566 (N.D.N.Y. 2000) (noting the parallel rule under New York law "that a police officer's motives are immaterial to the question whether an arrest or detention is based on probable cause").  Based on the totality of the circumstances, it is clear that defendants had probable cause to arrest plaintiff for simple trespass.  Therefore, both her false arrest and malicious prosecution claims fail as a matter of law and are dismissed.  *See Dickerson*, 604 F.3d at 751.


**II.     National Origin Discrimination**

Plaintiff brings discrimination claims pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 1983 against all defendants based upon the events that transpired after she was arrested.  (Compl. at ¶¶ 38-44).  As a preliminary mater, the Court notes that where defendants are state actors, Section 1983, not Section 1981, is the appropriate vehicle through which a plaintiff may pursue discrimination claims for damages.  *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 734 (1989) ("We hold that the express action at law provided by § 1983 for the deprivation of any rights, privileges, or immunities secure by the Constitution and laws provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed

14

against a state actor"). "The holding in *Jett* has been interpreted to encompass not only governmental entities, but also individuals sued in their individual capacities who are state actors." *Whaley v. City University of New York*, 555 F. Supp. 2d 381, 400-401 (S.D.N.Y. 2008). Plaintiff seeks damages from defendants, who are unquestionably state actors. *See id.* (finding that "state employment has generally been deemed sufficient to render the defendant a state actor"). Therefore, the Court will resolve plaintiff's Section 1981 claims pursuant to Section 1983 standards.[9]

"Because Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred . . . the first step in [analyzing a Section 1983 claim] is to identify the specific constitutional right allegedly infringed." *Albright v. Oliver*, 510 U.S. 266, 272 (1994). Plaintiff asserts a Section 1983 claim against all individual defendants for "depriv[ing] plaintiff of her rights, privileges and immunities under the laws and Constitution of the United states, and in particular, of her right[] to . . . equal protection under the law." (Compl. at ¶ 48.) Specifically, plaintiff alleges that she was detained for longer than the other arrestees because police officers impermissibly discriminated against her on the basis of her national origin. (*See* Compl. at ¶¶ 20, 27, 40.) Defendants' conduct, she claims, "was done intentionally, maliciously, and/or with reckless disregard of the natural and probable consequences of their acts . . . in violation of Plaintiff's constitutional rights as guaranteed under the Fourteenth Amendment." (*Id.* at ¶ 53.)

The crux of plaintiff's alleged equal protection violation is a selective enforcement claim. To establish an equal protection claim based on selective enforcement, a plaintiff must prove that: "(1) the plaintiff, compared with others similarly situated, was selectively treated; and (2) that such

---

[9] It is well-settled that Section 1981 does not prohibit discrimination based on national origin. *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998); s*ee also Ganthier*, 345 F. Supp. 2d at 281; *Chimarev v. TD Waterhouse Investor Services, Inc.*, 280 F. Supp. 2d 208, 224 (S.D.N.Y. 2003) (holding that a Russian-born plaintiff could not state a claim under Section 1981 because his claims "exclusively relate[d] to discrimination based on national origin"). Therefore Section 1981 is doubly ill-suited to plaintiff's purposes here.

selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Brown v. City of Syracuse*, 673 F. 3d 141, 151-151 (2d Cir. 2012).

Plaintiff's failure to offer any evidence that defendants' actions were based in any way upon her national origin dooms her selective enforcement claim.  As holds true for any equal protection claim, the second prong of a selective enforcement claim requires a plaintiff to demonstrate that "discriminatory purpose was a motivating factor in the government decision."  *Adler v. Kent Village Housing Co., Inc.*, 123 F. Supp. 2d 91, 98 (E.D.N.Y. 2000); *see also J.E. ex rel Edwards v. Center Moriches Union Free School Dist.*, 898 F. Supp. 2d 516, 547 (E.D.N.Y. 2012) ("To state a claim for an equal protection violation, plaintiffs must allege that a government actor intentionally discriminated against them *on the basis of* race, national origin, or gender.") (emphasis added). Plaintiff has wholly failed to demonstrate that defendants' actions were motivated in any way by impermissible considerations regarding her national origin.  Plaintiff argues that she "was treated in a harsh and disparate manner relative to her non-minority counterparts at the jail," and that the police "intentionally withheld her release on the basis of her ethnicity."  (Pl.'s Opp'n at 12-13.) However, she offers no specific facts – let alone evidence – in support of this claim.

Defendants argue that "[p]laintiff was detained longer than some of the other arrestees because she did not have an identification with an address on it, *not* because she was an immigrant," further stating that "[a]ll of the arrestees with out-of-country identification lacking an address, including plaintiff, were not released from the Precinct with a desk appearance ticket, but were transported to Central Booking."  (Mot. Summ. J. at 15.)  Plaintiff offers no evidence to rebut this non-discriminatory explanation, nor does she point to a single comment made or action taken by defendants that could be construed as motivated by discriminatory animus.  *See Carson v. Lewis*, 35 F. Supp. 2d 250, 271 (E.D.N.Y. 1999) (granting summary judgment for defendants where

16

"plaintiff[] . . . failed to produce any evidence whatsoever, beyond conclusory statements" of any discriminatory animus).   In fact, in her own deposition plaintiff states that an officer told her that his shift was ending, and "so [she was] going to stay much longer because we don't want to stay here for extra paperwork." (Zaniewska Dep. at 106:17-19.)  Plaintiff's own account of her ordeal suggests at least one alternative, racially neutral reason for the delay in her release. As plaintiff cannot show that the defendants' actions were improperly motivated, her discrimination claims are dismissed.  *See Adler*, 123 F. Supp. 2d at 98.

III.    **Municipal Liability**

Plaintiff asks this Court to impose liability on the City of New York under two separate theories.  First, she puts forth a § 1983 claim pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), alleging that the City has perpetuated a discriminatory policy of detaining foreign nationals who cannot provide a verifiable home address.  (*See* Compl. at ¶¶ 27, 29-30, 56, 59.)  Second, she argues that the City should be liable under state law on a theory of negligent supervision and failure to train its police officers.  (*See id.* at ¶¶ 80-85.)  For the reasons that follow, both of these claims fail.

A. **42 U.S.C. § 1983 *Monell* Claim**

Plaintiff alleges that "[d]efendants' violations of [p]laintiff's constitutional rights . . . resulted from a [m]unicipal custom, policy and practice pursuant to <u>Monell v. Department of Social Services</u>." (Compl. at ¶ 56.)  Specifically, plaintiff alleges that "police officers have been trained by [d]efendants to detain individuals, particularly foreign nationals such as plaintiff, after [*sic*] under arrest even when they have verifiable, government issued identification purely because such individuals do not have proof of their home address readily available." (Pl. Opp'n at 18.)  The crux of plaintiff's *Monell* claim is that defendants "have trained their municipal police officer employees

17

to disparately treat and discriminate against individuals of foreign ethnicity . . . under the guise of insufficient identification."[10]  (*Id*.)

It is black letter law that a *Monell* claim does not provide a separate cause of action and must be predicated on an underlying, independent constitutional violation.  *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (noting that *Monell* merely "*extends* liability to a municipal organization where that organization's failure to train, or the policies and customs that it has sanctioned, led to an independent constitutional violation").  Therefore, in order to sustain a *Monell* claim, plaintiff – as a threshold matter – would have to put forth sufficient evidence to show that defendants' decision to hold her longer because she could not present identification with a verifiable address on it was motivated by unconstitutional discriminatory animus.  As the Court has explained, plaintiff has entirely failed to show that defendants' actions were in any way motivated by the fact that plaintiff is of Polish origin.  Because plaintiff has failed to demonstrate that her constitutional rights were violated by the individual defendants, her *Monell* claim against the City cannot survive. Accordingly, plaintiff's claim against the City of New York is dismissed.

**B.** **Failure to Train and Negligent Supervision under New York Law**

Plaintiff also asserts a claim under New York state law for negligent training or supervision. According to plaintiff, "[d]efendants knew or should have known that their negligent training and/or supervision would lead to injury."  (Pl.'s Opp'n at 21.)  Specifically, plaintiff claims that defendant

---

[10] Grasping at straws, plaintiff also argues "in the alternative" that "[d]efendants have put into existence a formal custom, policy and practice which violate [*sic*] the constitutional rights of arrestees [by] . . . diverting arrestees to and housing them in an outside police precinct when is [*sic*] Central Booking is closed until it opens."  (Pl.'s Opp'n at 20.) She also argues that the City has an unlawful policy of "arresting and detaining individuals for non-criminal offenses such as simple trespass."  (*Id*.)  Plaintiff raises these two alternative *Monell* claims for the first time on summary judgment; her complaint contained no mention of these alleged "policies."  Therefore, the Court will not consider them here.  *See Thomas v. Egan*, 1 Fed. App'x 52, 54 (2d Cir. 2001) (Summary Order) ("[I]t is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion."); *Beckman v. U.S. Postal Service*, 79 F. Supp. 2d 394, 408 (S.D.N.Y. 2000) ("Although a complaint need not correctly plead every legal theory supporting the claim, at the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense.").  In any event, neither purported policy would sustain a *Monell* claim, as neither is predicated on a violation of plaintiff's constitutional rights.  *See Segal*, 459 F.3d at 219 (a *Monell* claim is contingent on the existence of an independent constitutional violation).

Coyle's negligent supervision of defendant Lormil lead to plaintiff's arrest without probable cause, and that unspecified defendants' "negligent training of named defendants" lead to plaintiff's malicious prosecution.  (*Id.*)  "Under New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." *Bernard v. U.S.*, 25 F.3d 98, 102 (2d Cir. 1994) (relying on *Boose v. City of Rochester*, 421 N.Y.S.2d 740, 744 (App. Div. 1979) (holding that a plaintiff challenging the preparation of her case by police "may not recover under broad general principles of negligence . . . but must proceed by way of the traditional remedies of false arrest and . . . malicious prosecution")); *see also McSween v. Edwards*, 91 F. Supp. 2d 513, 525 (E.D.N.Y. 2000) ("New York law prohibits recovery under a general theory of negligence when the traditional remedies of false arrest and imprisonment are available").  Plaintiff's negligence claim against the City is therefore barred.  *See Bernard*, 25 F.3d at 98 (finding that *Boose* "bars all negligence claims arising out of allegedly improper . . . procedures during an arrest").

Notwithstanding the holding in *Bernard*, upon which this Court now relies, some courts in this circuit have held that "a cause of action sounding in negligence is legally sustainable against a city when the injured party demonstrates that he was injured due to the negligent training and supervision of a law enforcement officer." *Hardin v. Meridien Foods*, No. 98 CIV. 2268 (BSJ), 2001 WL 1150344, at *9 (S.D.N.Y. Sept. 27, 2001) (citing two New York cases); *see also Kurschus v. Painewebber, Inc.*, 16 F. Supp. 2d 386 (S.D.N.Y. 1998).  However, even if this Court determined that a claim for negligent supervision is legally cognizable, any such claim would nonetheless fail because, as the Court has explained, plaintiff has no cognizable claims against the police officers themselves and thus has not suffered any injury as a result.  *See Kurschus*, 16 F. Supp. 2d at 397 (finding that where police officers had probable cause to arrest plaintiff, plaintiff had no cognizable

19

claims against the officers and therefore no claim against the county for negligent training and supervision).  Accordingly, plaintiff's claim for negligent training and supervision is dismissed.

## IV.     Intentional Infliction of Emotional Distress

Finally, plaintiff's claim for intentional infliction of emotional distress also fails as a matter of law.  To make a showing of intentional infliction of emotional distress under New York law, a plaintiff must prove four elements: "(1) extreme and outrageous conduct; (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996).  New York sets a very high threshold for conduct that is "extreme and outrageous" enough to satisfy the first element of this tort.  *Id.* at 791.  In fact, the conduct must be "so outrageous and shocking that it exceeds all reasonable bounds of decency as measured by what the average member of the community would tolerate."  *Brewton v. City of New York*, 550 F. Supp. 2d 355, 369 (E.D.N.Y. 2008).  "Emotional distress is severe when it is of such intensity and duration that no reasonable person should be expected to endure it."  *Id.*

Defendants' conduct does not approach the high threshold for "extreme and outrageous conduct" contemplated by New York Law.  Plaintiff claims that the arrest itself – including being handcuffed too tightly – caused her emotional distress.  (*See* Pl.'s Opp'n at 20.)  In addition, she claims that at the Precinct, she was not immediately provided with water or allowed access to her cell phone, and that the jail cell and bathroom were "tiny" and "disgustingly unsanitary," respectively.  (*See id.* at 22.)  Plaintiff argues that "[a]s a result of her horrific experience at the hands of defendants, [she] now suffers from severe emotional distress, such as depression and panic attacks, which requires medication and physician visits."  (*Id.* at 23.)  Even viewing the facts in the light most favorable to plaintiff, as the Court must, it is clear that defendants' conduct at no point rose to the level of outrageousness required to sustain a claim for intentional infliction of emotional

20

distress.  Though the experience was undoubtedly unpleasant for plaintiff, the standard for

intentional infliction of emotional distress in New York is extremely high.  Plaintiff has simply

failed to provide evidence of the extreme and outrageous behavior required to satisfy that standard,

and her claim of intentional infliction of emotional distress is therefore dismissed. [11]

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Doc. No. 48) is

GRANTED in its entirety and this case is DISMISSED with prejudice.  The Clerk of Court is

directed to enter judgment accordingly and close the case.

SO ORDERED.

Dated: Brooklyn, New York
      August 5, 2013

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge

---

[11] In any event, plaintiff's emotional distress claim may be "encompassed entirely within other available tort remedies and . . . thus precluded under New York law."  *Brewton*, 550 F. Supp. 2d at 370 (relying on *Fischer v. Maloney*, 43 N.Y. 2d 553 (Ct. App. 1978) (holding that "the tort of intentional infliction of emotional distress may not be used as a substitute for an available traditional tort theory)).  Because plaintiff argues that her emotional distress stems from the arrest and its aftermath, her intentional infliction of emotional distress claim may be duplicative of her false arrest and malicious prosecution claims.  *See Worytko v. County of Suffolk*, No. 03-CV-4767 (DRH)(ARL), 2007 WL 1876503, at *5-6 (E.D.N.Y. June 28, 2007).  Accordingly, "because the conduct comprising [plaintiff's] intentional infliction of emotional distress claim is encompassed entirely within her state law claims for false arrest and malicious prosecution, this cause of action must be dismissed for it does not lie as a matter of state law."  *Brewton*, 550 F. Supp. 2d at 370.